**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **JASON KERR** ***and*** **JENNIFER KERR,**<br><br>***Plaintiffs,***<br><br>**v.**<br><br>**CITY OF PERRY, GEORGIA,** ***et al.*****,**<br><br>***Defendants.*** | **CIVIL ACTION NO.**<br>**5:24-cv-00285-TES** |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

"When an officer lawfully arrests an individual for the commission of a crime, *no matter how minor the offense*, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) (emphasis added) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")). But, just because black-letter law allows an officer to arrest someone for even a minor offense doesn't mean they always should. In this case, the Court finds that the officers had the legal right to arrest Mr. Kerr. Whether they should have is not for the Court to say.

Before the Court are motions for summary judgment by Defendants Tyler Tripp,

Heath Dykes, Alan Everidge, Sean Whilden, and the City of Perry, Georgia. [Doc. 56]; [Doc. 58]. Plaintiffs Jason and Jennifer Kerr filed their Third Amended Complaint on October 3, 2025. [Doc. 45]. In it, they assert claims for damages under 42 U.S.C. § 1983 and Georgia law against the above-named Defendants. [*Id.* at pp. 7–11]. Tripp filed a motion to dismiss, which this Court granted in part, dismissing Plaintiffs' state law claims against him. [Doc. 47]; [Doc. 50]. All Defendants then filed motions for summary judgment. [Doc. 56]; [Doc. 58]. For the following reasons, the Court **GRANTS** both motions for summary judgment.

## FACTUAL BACKGROUND[1]

On June 18, 2023, Mr. Kerr drove his Hummer to the Skweeky Kleen Car Wash.[2] [Doc. 58-1, ¶ 1]; [Doc. 56-1, ¶ 1]; [Doc. 54, ¶ 1]. After loading onto the car wash tracks, Mr. Kerr's vehicle began to move forward and struck an electronic sign. [Doc. 58-1, ¶¶

[1] With two separate motions on the table and several different body camera videos in the record, the Court pauses to specifically address its factual background section. To be sure, each fact could come from several places in the record. To simplify things, the Court tried, where possible, to pull facts from the Defendants' statements of material facts that Plaintiff did not dispute. [Doc. 56-1]; [Doc. 58-1]; [Doc. 61-4]; [Doc. 62-4]. Otherwise, the Court draws from the stipulated body camera footage. As for the body camera footage, the parties filed the videos as Exhibits. *See* [Doc. 54]; [Doc. 55]. The Court cites to their document titles as filed, rather than trying to designate a new name for each. Therefore, "Exh A" through "Exh F" are body camera footage, and so is "Tripp Body Camera Footage." To be clear, Exh A, B, D, E, and F are all clips of Whilden's body camera footage. Exh C is Hunter's body camera footage. Tripp Body Camera Footage is obviously Tripp's body camera footage.

[2] Ordinarily, the Court would refer to parties by their positions in the lawsuit. Here, there are two plaintiffs who share the same last name. Accordingly, rather than refer to them as "Plaintiff Jason Kerr" and "Plaintiff Jennifer Kerr" or any other variation, the Court will simply refer to them as Mr. Kerr and Ms. Kerr. This is, of course, for stylistic purposes to hopefully avoid any confusion. Since one side does not have its positional identifier, the Court will omit it for the other side as well to make for easier reading. Therefore, the Court will refer to "Defendant Tripp," for example, as "Tripp."

2–3]; [Doc. 56-1, ¶ 2]. He quickly backed off the tracks. [Doc. 58-1, ¶ 4]. Car wash employees asked him to sign a document, but he refused to do so and drove away. [Doc. 56-1, ¶¶ 4–5]; [Doc. 58-1, ¶ 5]. The employees then called law enforcement. [Doc. 59-1, ¶ 8]. Whilden, a Perry Police Officer, was dispatched to investigate the accident along with non-party Officer Hunter. [Doc. 56-1, ¶ 8]; [Doc. 58-1, ¶ 9]; [Doc. 54, ¶ 3].

When he arrived at the car wash, Whilden went straight to the entrance. Exh B 00:00–00:20. There, he came across four employees gathered around an archway over the wash's black and blue tracks. *Id.* at 00:26–00:29. The arch had Skweeky Kleen Car Wash branding in the upper center. *Id.* The upper left bend said, "ask about our Fundraising Program!" *Id.* The upper right bend said, "Unlimited Washes starting at $19.99." *Id.* The vertical parts of the archway—both the left and right sides—each contained a boxy, rectangular sign. *Id.* The left sign had four images with lights along its outer edge. *Id.* When Whilden arrived, the right sign was completely faceless, with its metal interior exposed. *Id.* This image from his body camera shows the damage to the sign:




*Id.* at 00:41.

Whilden discussed the damage with the employees at the car wash who were trying to bend the sign's housing back so that cars could pass through the archway again. *Id.* at 00:50–00:58. During these conversations, district manager Bert Weaks walked up. *Id.* at 00:13. Whilden told the employees, "I need to know about what we're dealing with in terms of damage." *Id.* at 01:27–01:30. Weaks then said, "Gotta be like 500." *Id.* at 01:29–01:32. He then added, "at least," after an unnamed manager of a different store said the same. *Id.* at 01:32–01:34. After spending a few minutes rigging the face back onto the sign, Weaks said "it's not going to work until we get a new sign." *Id.* at 05:21–05:23.

While at the car wash, Whilden asked the employees about what they saw during the incident. Two employees witnessed it: Desmond and Tim. Together, they said that Mr. Kerr still had the car in drive after Desmond gave him the first set of instructions, so Desmond gave the instructions again. Exh E 01:10–01:16. Mr. Kerr's tires were straight when he got on the track. *Id.* at 00:38. Desmond turned his head, heard a loud crunching sound, and when he turned back, the car was impacting the sign. *Id.* at 01:15–01:18. Somehow, the tires had turned toward the sign. *Id.* at 00:39–00:47. Tim speculated that Mr. Kerr turned the wheel. *Id.* Notably, Tim also described the car for Whilden: "It's a white hummer with big rims, and it's got, it's got black [inaudible] and it's got a tire on the back. And his lawn business, I think, is on the side. With a phone number." Exh B 04:53–05:04.

When discussing the issue of monetary damage again, the unnamed other manager began searching the internet for replacement signs. At the same time, Weaks affirmed that he thought the damage would be "at least 500." *Id.* at 09:08. "Do you have any way to get an idea of what it—a closer cost might be to replace?" Whilden asked. *Id.* at 09:11–09:16. The unnamed manager said, after searching online, that it would be "between 7 thousand and 29 thousand to replace the whole arch." *Id.* at 09:23–09:28. "Are you going to have to replace the whole arch?" Whilden asked. *Id.* at 09:29–09:30. "Nah probably just that sign," the unnamed manager replied. *Id.* at 09:31–09:32. Weaks said that he didn't "think we're going to be able to go on, on the, on the web and find a

price for that sign." *Id.* at 09:38–09:34. He later said, "we do need to find out how much it's gonna . . . ." *Id.* at 10:27–10:30. He did not finish the sentence but instead pulled out his phone as he was speaking. Then, Whilden said, "Alright. Give me one quick second. I'm going to make a phone call, and we'll go from there, okay?" *Id.* at 10:33–10:36. "Okay, I'll see if I can't get a good price for you." Weaks replied. *Id.* at 10:36–10:39. Later, while Whilden was in his police vehicle, Weaks's voice can be heard on the body camera footage listing the price as "2,537 dollars and 69 cents and there'd be labor." Exh D 00:00–00:04.

Upon concluding business at the car wash, Whilden traveled to the Kerr residence. [Doc. 56-1, ¶ 15]; [Doc. 58-1, ¶ 14]. Tripp, a Houston County deputy sheriff, joined him there. [Doc. 56-1, ¶ 15]; [Doc. 58-1, ¶ 14]; Exh F 00:00–00:10. At the Kerr residence, Whilden found a white hummer parked in the driveway with a tire on the back and a business and phone number on the side. Exh F 00:17–00:31. Ms. Kerr greeted the officers. [Doc. 56-1, ¶ 17]; [Doc. 58-1, ¶ 15]. Upon learning that the officers were looking for Mr. Kerr, she went to get him. [Doc. 56-1, ¶ 18]; [Doc. 58-1, ¶ 16].

Mr. Kerr emerged holding a putty scraper, followed by Mrs. Kerr. Exh F 01:38–01:44. After Tripp, Whilden, and Mr. Kerr introduced themselves, Whilden asked Mr. Kerr to tell him what happened. *Id.* at 01:55–02:40. Mr. Kerr said:

> They put me on the tracks. The tracks were moving. They're pulling my truck in. The tracks were moving before I even get on there, so I'm trying to put it in neutral and it turned me into their sign. So I backed up out of there and then they were like, "Hold on. We need you to fill this out." I was

like, "I ain't signing shit, dude. Y'all the one that pulled me into here."

*Id.* at 02:05–02:23.

Whilden asked Mr. Kerr to put the putty scraper on the ground. Mr. Kerr turned around and threw the scraper underhand toward the house. *Id.* at 02:25–02:29. Whilden then approached Mr. Kerr and told him to turn around and put his hands behind his back. *Id.* at 02:42. Mr. Kerr backed away, pulled one arm away from Whilden, raised both arms and asked, "What am I getting arrested for?" *Id.* at 02:43–02:45. At this point, Tripp pulled out his taser. Tripp Body Camera 03:06. Tripp kept his taser out between 29 and 39 more seconds. *Id.* at 03:45.[3] During that time, Mr. Kerr repeatedly asked "Am I getting arrested?" *Id.* at 03:06–03:12. As Whilden began handcuffing him, Mr. Kerr demanded a supervisor. *Id.* at 03:16. Ms. Kerr told Mr. Kerr to let the officers do their job. *Id.* at 03:22–03:25.

Mr. Kerr, now calm, asked Whilden to double up the handcuffs. *Id.* at 03:26. He asked a few seconds later, "will you please put a second one on there so we can double it up?" *Id.* at 03:40. Whilden said he would. *Id.* at 03:43. Indeed, he then doubled the handcuffs, connecting one set to the other to effectively make them longer. *Id.* at 03:53. While Whilden applied the two sets of cuffs, Mr. Kerr told his side of the story once again. *Id.* at 04:10–04:38. He said:

---

[3] To reiterate what the Court said in its previous Order, the last time the taser is visible in frame is actually at 03:35. Tripp Body Camera Footage 03:35. Looking at Whilden's body camera footage shows that Tripp holstered his taser sometime between 03:35 and 03:45 on Tripp's camera's runtime, with the actual time probably closer to the 03:45 mark.

> I pull into the thing. They say, "put it in neutral." As I'm trying to put it in—sorry—as I'm trying to put it in neutral, my truck gets pulled over to the right. I'm getting pulled into the sign. So, they hit the emergency stop. I put it in reverse. And then they keep me there for about ten minutes trying to figure everything out, and then they're trying to make me sign something. I said I'm not signing anything.

*Id.* at 04:11–-04:29.

Mr. Kerr asked Whilden to loosen the left cuff a little. *Id.* at 05:04. Whilden said "I'm going to try to accommodate you as much as I can, okay?" *Id.* at 05:05–05:09. Whilden explained what was happening and then walked Mr. Kerr to a police car. *Id.* at 06:27–07:08. As he put him into the car, Whilden said, "I'm going to try to accommodate wherever I can. You're a big ole boy. I understand." Gesturing to the police car, Whilden continued, "I don't fit in these things either. So, fit how you're comfortable, okay? This will be a short ride[.]" *Id.* at 08:45–08:52. After some back and forth, he then added, "the easiest thing to do is go butt first." *Id.* at 09:01. When Mr. Kerr was in the car, Whilden said, "there's no making it comfortable. I apologize." *Id.* at 09:09–09:10. As he closed the door, Whilden suggested a way Mr. Kerr could turn to fit in the car better, and then said, "I'm going to make this as comfortable as we can make it." *Id.* at 09:44. Whilden transported Mr. Kerr to jail where he spent roughly two hours until Ms. Kerr bailed him out. [Doc. 58-1, ¶¶ 26–27]; [Doc. 56-1, ¶ 22]. In total, Mr. Kerr spent approximately 36 minutes and 39 seconds in handcuffs. Exh F 04:34–41:13. When he took the handcuffs off, Whilden said, "I know that shit hurts, dude." *Id.* at 41:13.

Mr. Kerr later went to the Perry Police Department to file a complaint and spoke

with Major Dykes. [Doc. 58-1, ¶ 29]. At some point, Mr. Kerr brought the owners of the car wash—one of whom he knew—to the police department. [*Id.* at ¶ 30]. The owners stated they did not wish to press charges. [*Id.*]. Dykes gave Mr. Kerr a waiver, and, according to Mr. Kerr, told him that if he signed the waiver, the charges would be dropped. [*Id.* at ¶ 31]. Mr. Kerr did not sign the waiver, but the charges were ultimately still dropped. [*Id.* at ¶ 32]; [Doc. 56-1, ¶ 24].

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437.

The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)); Fed. R. Civ. P. 56(c)(1)(A).[4] "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

At this stage, "credibility determinations, the weighing of the evidence, and the

[4] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

The nonmovant's evidence is to be believed, and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "[I]f a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Sconiers*, 946 F.3d at 1263.

## ANALYSIS

Easy stuff first. Plaintiffs "concede[ their] claim[] against the City of Perry and Chief Everidge for failure to train." [Doc. 62-1, p. 22 n.3]. The Court, therefore, **GRANTS** summary judgment as to Count One, "Failure to Properly Train and Supervise . . . ." for Everidge and The City of Perry, Georgia ("The City"). [Doc. 58]. The Court addresses Plaintiffs' remaining claims against The City and Everidge below. The Court moves next to where it left off in its previous order: the claims against Tripp.

Mr. Kerr brings claims against Tripp under 42 U.S.C. § 1983 for "unlawfully

detaining and arresting, as well as exercising unlawful, unnecessary and excessive force against [Mr. Kerr]."[5] [Doc. 45, p. 8]; *see Watkins v. Davis*, No. 23-13616, 2025 WL 2730900, at *17 (11th Cir. Sept. 25, 2025) (where the court separately analyzed a claim for unlawful detention and a claim for excessive force). Tripp argues he is entitled to summary judgment for the claims against him because he enjoys qualified immunity from suit. [Doc. 56-2, p. 8]. Qualified immunity "shields government officials who perform discretionary functions from civil liability when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Edwards v. Grubbs*, 179 F.4th 909 (11th Cir. 2026) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)).

To receive qualified immunity, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Id.* (quoting *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016)). Here, it is undisputed that Tripp was acting within the scope of his authority. [Doc. 61-1, p. 6]. Since that threshold requirement is satisfied, the burden shifts to Mr. Kerr to show that qualified immunity does not apply. *Id.* To do so, he must show "(1) a violation of a constitutional right (2) that 'was clearly established at the time of [Tripp's] alleged misconduct.'" *Id.* (quoting *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir.

---

[5] The Court previously granted Tripp official immunity for Plaintiffs' state law claims against him and dismissed those claims. [Doc. 50, p. 16].

2021)). He must establish both prongs to overcome qualified immunity. *Id.*

Mr. Kerr argues that Tripp violated two of his constitutional rights. [Doc. 61-1, pp. 7, 12]. First, he argues that Tripp "detained or arrested [him] in violation of the Fourth Amendment" by arresting him without probable cause. [*Id.* at p. 7]. "Probable cause exists when the facts and circumstances, of which the official has reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense." *Dunn v. City of Fort Valley*, 464 F. Supp. 3d 1347, 1361 (M.D. Ga. 2020) (quoting *Elmore v. Fulton Cty. Sch. Dist.*, 605 F. App'x 906, 911 (11th Cir. 2015)); *see also Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019).

"An officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause to make the arrest." *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023). "But if 'reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause existed,' then the absence of probable cause is not 'clearly established,' and qualified immunity applies." *Bailey v. Swindell*, 940 F.3d 1295, 1300 (11th Cir. 2019). Put differently, if there was actual probable cause, there was no constitutional violation, and if there was arguable probable cause, the test fails at the clearly established prong. *See Bailey*, 940 F.3d at 1300 n.5; *see also Watts v. Parr*, No. 1:18-cv-79 (LAG), 2020 WL 13281407, at *11 n.4 (M.D. Ga. Nov. 30, 2020).

Tripp argues the "any-crime rule" applies. [Doc. 56-2, p. 11]. Indeed, "[a]s long as the circumstances known to the arresting official, when viewed objectively, can 'give probable cause to arrest *for any crime*, the arrest is constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges.'" *Dunn*, 464 F. Supp. 3d at 1361 (quoting *Elmore*, 605 F. App'x at 914); *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020). Furthermore, Tripp argues that the "fellow officer rule" applies here, since Tripp "had no information about the conduct" of Mr. Kerr and was not at the car wash. [Doc. 56-2, p. 12]; *see also Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012). It does. Therefore, the inquiry is whether Whilden had the requisite knowledge—attributable to Tripp—of circumstances that, when viewed objectively, gave probable cause for any crime.

Broadly, here are the circumstances Whilden knew before he arrested Mr. Kerr.[6] Employees of Skweeky Klean Car Wash said they guided a hummer onto the car wash tracks. The hummer was white with a business logo and phone number on the side. They turned to the next vehicle to guide it into the tracks. There was a loud crunching sound. When the employees turned back to the hummer, they saw its wheels turned all the way to the right, and it was crushing the sign at the entrance of the wash. The hummer backed out of the car wash. The driver declined to sign anything and then drove off.

[6] Whilden's knowledge of these circumstances is evidenced by his body camera footage.

The district manager deemed the sign inoperable. When asked about how much it would cost to replace the sign, the managers never gave an estimate below $500. The manager of a different location estimated the entire archway would cost between $7,000 and $29,000 to replace. After some research, the district manager came back with an exact figure for the damaged section of the arch: $2,537.69 plus labor.

Mr. Kerr had a white hummer parked in his driveway with black tires, a tire on the back, and a business phone number on the side. Mr. Kerr admitted he was at the car wash that morning, and said, essentially, that the car wash tracks pulled his hummer into the sign. Whilden then arrested Mr. Kerr.

Tripp argues these circumstances gave probable cause to arrest Mr. Kerr for violating O.C.G.A. § 40-6-273. That statute reads:

> The driver of a vehicle involved in an accident resulting in injury to or death of any person or property damage to an apparent extent of $500.00 or more shall immediately, by the quickest means of communication, give notice of such accident to the local police department if such accident occurs within a municipality. If such accident occurs outside a municipality, such notice shall be given to the office of the county sheriff or to the nearest office of the state patrol.

O.C.G.A. § 40-6-273. Mr. Kerr attacks probable cause under this statute on three fronts, arguing that he was not a "driver," the statute is limited to accidents on public roadways, and the apparent extent of damage was not over $500. [Doc. 61-1, pp. 7–17].

The Court takes Mr. Kerr's arguments in reverse order. First, the apparent extent of damage to the sign was over $500. Mr. Kerr says that "Defendants ignore the other

estimates of $7,000 and $29,000 that were given by employees at the car wash." [Doc. 61-1, p. 12]. He argues that these estimates create uncertainty around the damage. [*Id.*]. But a review of the body camera footage shows that the "other estimates of $7,000 and $29,000" by "employees" were one estimated range to replace the entire arch—not just the portion that was damaged—given by the unnamed manager of another store. Exh B 09:23–09:28. Rather than create uncertainty, this range provides context for the consistent estimates of over $500 in damage. While it did take the employees some time to land on an exact damage figure, they were consistent in their estimates of greater than $500, fulfilling the "apparent extent" requirement. When the district manager came back with an exact figure, it added more credence to this conclusion. Tripp clearly had at least arguable probable cause as to this element, addressed more below.

Mr. Kerr next argues that Section 40-6-273 is limited to public roadways. [Doc. 61-1, pp. 10–11 (quoting *Gutierrez v. State*, 510 S.E.2d 570, 574 (Ga. Ct. App. 1998))]. However, Georgia courts apply Section 40-6-273 to private property. *See Navarro v. Atlanta Cas. Co.*, 552 S.E.2d 508, 509 (Ga. Ct. App. 2001) (applied to a private parking lot); *Wing v. State*, 759 S.E.2d 243, 245 (Ga. Ct. App. 2014) (applied to church parking lot); *cf. Johnson v. State*, 685 S.E.2d 339, 340 (Ga. Ct. App. 2009) (applied to a car that ran off the road and struck a tree). The Court notes that there are only twenty cases that cite O.C.G.A. § 40-6-273 on Westlaw, one of which is the previous order in this case, and

another cites an older version of the statute.[7] *See Young v. City of Atlanta*, 631 F. Supp. 1498, 1500 (N.D. Ga. 1986) (quoting old version). Therefore, the Court finds that the limited cases cited above are sufficient to render Plaintiffs' argument unpersuasive. Furthermore, as discussed in more detail below, Whilden could not have known whether the statute applies to private property without a case clearly on point.

Mr. Kerr then turns to § 40-1-1(14)'s definition of "driver." [Doc. 61-1, p. 8]. It defines a "driver" as "every person who drives or is in actual physical control of a vehicle." § 40-1-1(14); *see also Keais v. Kelley*, No. A25A2193, 2026 WL 2056469, at *5 (Ga. Ct. App. July 15, 2026) (applying to § 40-6-273). Mr. Kerr argues that he wasn't driving or in physical control because "there is no dispute that [Mr. Kerr] put the car into neutral, took his foot off the brake, and took his hands off the steering wheel when he got into the car wash." [Doc. 61-1, p. 9]. However, the sources Mr. Kerr cites to support this claim—his affidavit and deposition and Defendants' statement of undisputed material facts—do not establish that *Whilden knew at the time of arrest* that Mr. Kerr had the car in neutral, foot off the brake, and hands off the steering wheel.

If anything, the sources Mr. Kerr cites—when viewed alongside his statements to Whilden right before arrest—establish competing narratives about whether Mr. Kerr actually had the car in neutral, foot off the brake, and hands off the steering wheel during the incident. But, unfortunately for Mr. Kerr, that is not the inquiry here. The

---

[7] A search on Lexis produces similar results.

inquiry for the court is not whether Kerr was actually a "driver" as that term is defined in the relevant Georgia statutes. Rather, the proper inquiry for the Court is whether Tripp had at least arguable probable cause at the time of Mr. Kerr's arrest that Mr. Kerr may have violated O.C.G.A. § 40-6-273, and that turns on what Whilden knew at the time of arrest. In addition to the employees' statements, Mr. Kerr gave him this version of events immediately before Whilden arrested him:

> They put me on the tracks. The tracks were moving. They're pulling my truck in. The tracks were moving before I even get on there, so I'm *trying to put it in neutral* and it turned me into their sign. So I backed up out of there and then they were like hold on . . . .

Exh F 02:06–02:20 (emphasis added). Mr. Kerr argues that "it would have been unreasonable for Officer Whilden to think that there was any violation of O.C.G.A. § 40-6-273 because all the available evidence indicated he was not driving at the time of the incident, nor was he in actual physical control of the vehicle." [Doc. 61-1, p. 10]. But, as shown above, the evidence available to Whilden at the time does not support that conclusion. Under these circumstances, a reasonably prudent person could believe that Mr. Kerr met the statutory requirements of § 40-6-273, and therefore it was not unreasonable for Whilden to believe he had probable cause for the arrest.

For the foregoing reasons, there was no constitutional violation here because probable cause existed that Mr. Kerr violated § 40-6-273. But, assuming there to be a constitutional violation, Tripp is still entitled to qualified immunity. As stated above, Plaintiffs must meet both parts of their burden under a qualified immunity analysis,

and they cannot meet the "clearly established" prong.

To be sure, at the time of Mr. Kerr's arrest, it was clearly established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. *Bailey*, 940 F.3d at 1300. "But for purposes of qualified immunity, it is insufficient to define [Mr. Kerr's] Fourth Amendment right at such a high level of generality." *Bracey v. Jolley*, No. 1:10-cv-4064-TCB, 2013 WL 12097643, at *4 (N.D. Ga. Mar. 27, 2013), *aff'd*, 562 F. App'x 918 (11th Cir. 2014) (citing *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987)). Instead, "the Court must also determine whether it was clearly established that the circumstances of [Mr. Kerr's] arrest did not constitute probable cause." *Id.* (citing *Anderson*, 483 U.S. at 640–41). The focus of the inquiry is the "objective legal reasonableness" of Whilden's (and therefore Tripp's) actions. *Id.* Therefore, Whilden and Tripp are "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest [Mr. Kerr.]" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). Put differently, Whilden and Tripp are entitled to qualified immunity "if they had *arguable* probable cause, even if they did not have *actual* probable cause." *Id.* (citing *Davis v. Williams*, 451 F.3d 759, 762 (11th Cir. 2007)). Finally, only decisions by the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court of the pertinent state (Georgia, here) can clearly establish law. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

Viewing the circumstances as Whilden knew them prior to the arrest under the

arguable probable cause standard, Whilden had arguable probable cause to arrest Mr. Kerr. Mr. Kerr's arguments against arguable probable cause are the same as his arguments against probable cause. *See* [Doc. 61-1, p. 20]. His statutory arguments fail to show that each of those were "clearly established law" at the time of his arrest. After all, there are only twenty cases that cite Section 40-6-273. Only one is a Georgia Supreme Court case, and it did not establish that 40-6-273 only applies on highways or that an "apparent extent" of property damage must come from certain sources or methods. *See Snyder v. State*, 657 S.E.2d 834, 837 (Ga. 2008) (using the immediacy requirement of § 40-6-273 to compare to the statute at issue). In other words, Tripp did not violate clearly established law by applying § 40-6-273 to private property or by concluding there was an apparent extent of at least $500 in damage.

As for Mr. Kerr's "driver" argument, he only cites cases from the Georgia Court of Appeals, and those can't clearly establish constitutional rights. *See* [Doc. 61-1, pp. 8–9]. Indeed, Tripp points to some of the same cases to argue his position that Mr. Kerr was a "driver" at the time of the incident. *Compare* [Doc. 61-1, p. 8 (citing *Harris v. State*, 103 S.E.2d 443, 444 (Ga. Ct. App. 1958)], *with* [Doc. 63, p. 6 (citing *Harris*, 103 S.E.2d)]. Absent a case on point from the Georgia Supreme Court, Eleventh Circuit, or United States Supreme Court holding that a person behind the wheel of a car that is being propelled or moved by an outside force such as car wash tracks is not a "driver," Tripp did not violate clearly established law. Accordingly, Mr. Kerr has not met his burden

under the qualified immunity analysis. Tripp is entitled to qualified immunity for Mr. Kerr's § 1983 claim of unreasonable seizure.

The second constitutional violation Mr. Kerr alleges against Tripp is excessive force. [Doc. 45, ¶ 38]. "The Fourth Amendment protects against excessive force in the arrest context." *Charles v. Johnson*, 18 F.4th 686, 699 (11th Cir. 2021). Courts use a "reasonableness" standard when evaluating the actions of the officer. *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 296 (1989) (citation omitted). To determine the reasonableness of force, courts "look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Charles*, 18 F.4th at 699 (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. Put differently, it's a totality of the circumstances test. *Charles*, 18 F.4th at 699.

Accordingly, there is a two-step process to determine whether an officer's use of force was unconstitutional. First, courts "ask whether the specific kind of force is

categorically unconstitutional." *Id.* Second, if it is not categorically unconstitutional, courts weigh factors. *Id.* Those factors are: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Here, Tripp pointed a taser at Mr. Kerr, and Mr. Kerr argues that "force" violated his constitutional rights. *See* [Doc. 61-1, p. 13]. "The use of a taser is not categorically unconstitutional," and "can be appropriate in a wide array of situations." *Charles v. Johnson*, 18 F.4th 686, 701 (11th Cir. 2021). The question is whether Tripp's use of a taser constituted excessive force under the totality of these circumstances.

The severity of the crime at issue weighs in Mr. Kerr's favor. The parties do not dispute that. [Doc. 56-2, p. 15]; [Doc. 61-1, p. 13]. They do disagree about the remaining two factors. For the second factor, Mr. Kerr argues that he did not pose an immediate threat to the safety of the officers because he was unarmed when he was arrested and his wife was there urging him to comply. [Doc. 61-1, p. 14]. Tripp argues that his body camera footage "shows [Mr. Kerr] to be a large, muscular man who undoubtedly posed a physical threat to the officers, and [Mr. Kerr] moved his arm away from Whilden when Whilden attempted to handcuff [him]." [Doc. 56-2, p. 15]. The parties do not disagree that size can be a factor in the threat analysis. [Doc. 61-1, p. 14]; [Doc. 63, p. 9]. They do disagree on the impact that size has on the threat analysis.

This factor is a close call as neither party pointed to caselaw directly on point. Mr. Kerr discarded the putty scraper before Tripp pulled out the taser. Furthermore, once things calmed down, Mr. Kerr was cooperative. On the other hand, Tripp did not hold the taser very long. The Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. Mr. Kerr was openly uncooperative when Whilden tried to handcuff him. He is also large and visibly strong. *E.W. v. Dolgos*, 884 F.3d 172, 180–81 (4th Cir. 2018) (look at the suspect's conduct at the time of arrest and the size and stature of the parties involved). To give the reader an idea, at the time of his arrest, Mr. Kerr was going to the gym a minimum of five days a week. [Doc. 56-5, Kerr Depo, p. 24:9–16]. Because officers are entitled to make split-second decisions, this factor weighs slightly in favor of Tripp.

For the third factor, Mr. Kerr briefly resisted arrest. His brief resistance directly led to Tripp drawing his taser. Weighing all three factors together—the first in Plaintiff's favor, the second as a very close call, and the third in Tripp's favor—along with the totality of the circumstances, the Court concludes that no constitutional violation occurred here.

Like his arrest, even if Tripp pulling out his taser amounted to a constitutional violation, Mr. Kerr has not met his burden regarding the second part of the qualified

immunity analysis. Specifically, Mr. Kerr failed to point to any caselaw from courts relevant to this inquiry that clearly establish at the time of the arrest that Tripp's pointing his taser at Mr. Kerr was unconstitutional under the surrounding circumstances. *See* [Doc. 61-1, p. 17 (citing cases for guns but not tasers)].[8]

Accordingly, Mr. Kerr has not met his burden under the qualified immunity analysis. Tripp is entitled to qualified immunity for Mr. Kerr's § 1983 claim of excessive force. That means Tripp is entitled to qualified immunity for both of Mr. Kerr's § 1983 claims against him. The Court, therefore, **GRANTS** Tripp's motion for summary judgment. [Doc. 56].

With Tripp's motion finished, the Court moves on to the motion for summary judgment for Defendants Whilden, Dykes, and The City. Whilden first. Whilden argues he is entitled to summary judgment for two reasons: qualified immunity for Mr. Kerr's unconstitutional arrest and excessive force claims, and official immunity for Mr. Kerr's state law claims. [Doc. 58-2, pp. 5, 15]. Looking at qualified immunity, Mr. Kerr does not dispute that Whilden, like Tripp, was acting within the scope of his discretionary authority. [Doc. 62-1, p. 7]. That brings the Court to step two, detailed above, where Mr. Kerr must show a constitutional violation that was clearly established at the time. Like

[8] Additionally, *Gould v. Guerriero*, No. 24-12818, 2025 WL 1291659 (11th Cir. May 5, 2025), which Mr. Kerr points to, cannot create clearly established law here because it was published after the incident at issue. The other case Mr. Kerr cites—*Croom v. Balkwill*, 645 F.3d 1240, 1253 (11th Cir. 2011)—ultimately held that the force was *de minimis* and upheld the district Court's grant of summary judgment.

against Tripp, Mr. Kerr first alleges a violation of his right to be free from unreasonable seizures when Whilden arrested him without probable cause. Because of the any-officer doctrine, the Court already analyzed Whilden's probable cause and arguable probable cause. For the reasons detailed above, Whilden is entitled to qualified immunity as to Mr. Kerr's unreasonable seizure claim.

Next, Mr. Kerr's excessive force claim. Mr. Kerr argues that Whilden used excessive force by handcuffing him and "knowingly ke[eping] him in overly tight handcuffs for over half an hour . . . ." [Doc. 62-1, p. 11]. But "only the most exceptional circumstances will permit an excessive force claim on the basis of handcuffing alone." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). Painful handcuffing alone is not enough. *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002); *Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019).

Mr. Kerr has not shown that these were "the most exceptional circumstances." Whilden doubled his handcuffs when Mr. Kerr asked him to, gave Mr. Kerr advice on how to remove some discomfort from the car ride, and told him he was making it all as comfortable as possible. Nothing in the body camera footage gives reason to doubt Whilden's statement. In total, Mr. Kerr was in handcuffs for approximately 36 minutes and 39 seconds. These circumstances are unlike those in cases where the Eleventh Circuit found excessive force for handcuffing, and more like those cases where the Eleventh Circuit found de minimis force. *See, e.g.*, *Sebastian*, 918 F.3d at 1305–09 (listing

de minimis force cases and finding a constitutional violation where officers intentionally used handcuffs to cause pain and injury, and the plaintiff was in the handcuffs for at least five hours). Mr. Kerr argues that "a reasonable jury could find that Officer Whilden used excessive force knowingly . . . ." [Doc. 62-1, p. 11]. The Court disagrees. *Josendis*, 662 F.3d at 1315; *Allen*, 121 F.3d at 646.

Moreover, like the other constitutional allegations above, even if Mr. Kerr is correct, he has not met the clearly established requirement to overcome qualified immunity. Mr. Kerr relies on *Sebastian*, arguing that "it is clearly established that substantial injuries inflicted on a person as a result of overly tight handcuffing violate clearly established law." [Doc. 62-1, p. 18]. But the facts of *Sebastian* are not materially like those here, and Mr. Kerr has not shown otherwise. Whilden did not intentionally tighten the handcuffs "in a manner . . . intended to cause pain," but instead accommodated Mr. Kerr to the extent he could. *Sebastian*, 918 F.3d at 1305. He did not place Mr. Kerr in the police vehicle "in a position and manner that increased the pain caused by the over-tightened flex-cuffs," but instead advised him on how to ease his discomfort. *Id.* at 1305–06.

Mr. Kerr was not in the car "for an unspecified period of time" and then "detained for more than five hours, still handcuffed behind his back," but instead was handcuffed for 36 minutes and 39 seconds, including the car ride. *Id.* Finally, and most importantly, *Sebastian* expressly limited its holding to the facts in that case. 918 F.3d at

1312 ("We do not mean to give law enforcement officers pause each time they employ handcuffs in the heat of an arrest . . . The peculiar facts of this case, not least [applying tight handcuffs after he complained and a five hour period in the cuffs,] cross over the hazy border between excessive and acceptable force . . . ."). Simply put, Mr. Kerr has not shown that Whilden violated clearly established law in these circumstances. Accordingly, Whilden is entitled to qualified immunity on Mr. Kerr's § 1983 claims.

That brings the Court to Whilden's second argument for summary judgment: official immunity for Mr. Kerr's state law claims. [Doc. 58-2, p. 15]. Official immunity applies to "public officials and employees sued in their individual capacities." *Jackson v. Dorsey*, No. 3:22-cv-144-TCB, 2023 WL 6214857, at *5 (N.D. Ga. Feb. 15, 2023). It "protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority[.]" *Slaughter v. Dooly Cnty.*, No. 5:06-cv-143 (CAR), 2007 WL 2908648, at *15 (M.D. Ga. Sept. 28, 2007). However, "officers can be liable for the negligent performance of ministerial acts within the scope of their authority as well as discretionary acts if committed with actual malice." *Id.* "Actual malice requires a deliberate intention to do wrong, and does not include implied malice, i.e. the reckless disregard for the rights or safety of others." *Hoyt v. Cooks*, 672 F.3d 972, 981 (11th Cir. 2012).

The first question, then, is whether the actions giving rise to Mr. Kerr's claims were discretionary or ministerial. Mr. Kerr does not argue against discretionary

function. [Doc. 62-1, pp. 20–21]. Regardless, Whilden's actions were discretionary. *See Goldring v. Henry*, No. 19-13820, 2021 WL 5274721, at *9 (11th Cir. Nov. 12, 2021) ("An officer's decision to arrest a person is a discretionary action."). Therefore, Mr. Kerr must show actual malice to overcome official immunity.

Actual malice sufficient to overcome official immunity is a high bar. *See Harris by & through Davis v. Autry*, No. 20-13480, 2022 WL 392169, at *5 (11th Cir. Feb. 9, 2022) (actual malice is a high bar; it's not ill will or reckless disregard for another's safety, but an actual intent to harm the plaintiff) (citing Georgia cases); *Hall v. Acker*, 885 S.E.2d 266, 272 (Ga. Ct. App. 2023). Mr. Kerr argues that a jury could infer actual malice from Whilden's actions. [Doc. 62-1, p. 20]. The Court, once again, disagrees. The events as viewed from the body camera footage show that Whilden understands that handcuffs can be painful and uncomfortable but are not sufficient to show that Whilden intended to harm Mr. Kerr through the handcuffs. The video clearly shows nothing malicious in the handcuffing at all. Therefore, Whilden is entitled to official immunity for Mr. Kerr's state law claims. The Court **GRANTS** Whilden summary judgment and moves on to the remaining Defendants.

Next, Mr. Kerr's *Monell* claim against The City. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978), the Supreme Court held that a plaintiff can sue a municipal entity for damages via § 1983 if the plaintiff alleges that he suffered a constitutional violation from the entity's policy or custom. "To prove a *Monell* claim, a plaintiff must

show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Andre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1300 (11th Cir. 2025).

Mr. Kerr claims that The City tried "to coerce [him] by offering something that is not allowed under Georgia law" when it gave him a waiver, in accordance with an alleged policy, that offered expungement in exchange for waiving The City's liability. [Doc. 62-1, pp. 22–23]. The City argues that it is entitled to summary judgment for Mr. Kerr's *Monell* claim because Mr. Kerr "suffered no harm and has no evidence suggesting that The City has a policy of 'coercing' accused individuals into signing a waiver of rights in exchange for non-prosecution." [Doc. 58-2, p. 18]. Mr. Kerr argues that there is a question of fact as to these three elements. [Doc. 62-1, p. 22]. The City is entitled to summary judgment for several reasons.

At the outset, Mr. Kerr cannot show harm. He did not sign the form, and the charges were still dropped. *See* [Doc. 65, p. 9]. He seems to allege that merely offering him the waiver was the harm, but the Court is not convinced. *See Barber v. Conradi*, 51 F. Supp. 2d 1257, 1263 (N.D. Ala. 1999) ("Threatening to deprive someone of a constitutional right is not the same thing as depriving someone of a constitutional right, and such threats do not, standing alone, support a cause of action under 42 U.S.C. § 1983."); *cf. Cook v. Randolph Cnty., Ga.*, 573 F.3d 1143, 1157 (11th Cir. 2009) ("an

attempted deprivation of constitutional or statutory rights is not the same as an actual deprivation").

The City is also entitled to summary judgment because Mr. Kerr has not presented sufficient evidence of a policy. Even viewing the evidence in the light most favorable to him, there is not a question of fact about whether The City had a policy or custom that caused a violation of Mr. Kerr's constitutional rights. *See Allen*, 121 F.3d at 646 ("A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice"). To establish a policy or custom that "defendants sign expungement paperwork," Mr. Kerr points to one page of Dykes's deposition. That page reads—with one of the attorneys asking the questions and Dykes answering—in its entirety:

> Q: You see that?
> A: Uh-hmm.
> Q: I want to ask you about that expungement. Can you do that?
> A: Expunge Charges?
> Q: Yeah.
> A: Yeah. We file an expungement.
> Q: You can?
> A: Have to do it with the agency, the arresting agency.
> Q: You can have it expunged?
> A: Well, he would have to agree to it. He would have to request it, let me say that.
> Q: Do you know—
> A: We have an expungement form. You come—if we're the arresting agency and the district attorney doesn't—and let me just preference that.
> Q: Uh-hmm.
> A: if we're the arresting agency, it has to come through our agency to start the - - start the expungement process.
> Q: And you can do that now, today? You can expunge, have a record expunged?

[Doc. 59-1, Dykes Depo., p. 40:1–25]. Simply put, this does not establish a policy or custom, or create a question of fact, especially when read in its surrounding context. Dykes goes on to say that "that's the process. That's what I know it to be. Now, if the law has changed here recently on that—because I haven't done expungement in a . . . that just don't fall in my realm of responsibility anymore." [*Id.* at p. 43:2–5]. At most, this shows that The City issued expungement documents when people came to file and request them during the period when expungement fell under Dykes's "realm of responsibility." It does not establish any policy or custom linked to an alleged violation of Mr. Kerr's rights. As such, Mr. Kerr failed to show both a constitutional harm and a policy that caused harm. The City is not liable under *Monell* and is entitled to summary judgment.

That brings the Court to Dykes. He argues that Mr. Kerr did not establish the elements of a tortious coercion claim against him, and, even if he did, Dykes is entitled to official immunity. [Doc. 65, p. 9]; [Doc. 58-2, p. 19]. Despite Mr. Kerr's arguments to the contrary, official immunity protects Dykes. The Court already laid out the legal elements of official immunity above. Mr. Kerr does not appear to dispute that Dykes's actions were discretionary. *See* [Doc. 62-1, p. 25]. That means Mr. Kerr must show that Dykes acted with actual malice. He has not done so. He once again argues that malice can be inferred here. At most, the evidence shows that Dykes gave Mr. Kerr a document to sign that the city attorney prepared. [Doc. 56-5, Kerr Depo., p. 82:3–7]; [Doc. 59-1,

Dykes Depo., p. 36:10–24]. It does not show that he drafted the document or intended to use the document to trap or coerce Mr. Kerr—it does not show malice. [Doc. 56-5, Kerr Depo., pp. 82–84]. Accordingly, Dykes is entitled to official immunity and summary judgment.

Finally, that leaves Ms. Kerr's loss of consortium claim. In Georgia, loss of consortium is a derivative claim. *Huddle v. Heindel*, 821 S.E.2d 61, 68 (Ga. Ct. App. 2018). Since all Defendants are entitled to summary judgment for Mr. Kerr's claims, Ms. Kerr cannot recover for her derivative claim. Defendants are entitled to summary judgment on her claim, too.

## **CONCLUSION**

In the end, Whilden and Tripp had probable cause to arrest Mr. Kerr, even for a minor traffic offense like O.C.G.A. § 40-6-273. Whether they should have arrested Mr. Kerr on Father's Day for such a minor offense doesn't factor into these specific claims. That really goes to the question of whether they should have immediately exercised the right to arrest or just allowed him to come down the next day. Perhaps they should have talked to the solicitor first before making the decision to arrest, especially over what was basically a civil matter related to who should pay for the damaged sign. But, those are not questions the Court can or should answer.

In the end, the Court finds no constitutional violation. For the foregoing reasons, the Court **GRANTS** Tripp's motion for summary judgment and **GRANTS** Defendants

Whilden, Dykes, Everidge, and The City of Perry, Georgia's motion for summary judgment. [Doc. 56]; [Doc. 58]. The Clerk of Court is **DIRECTED** to **ENTER** Judgment and **CLOSE** this case.

**SO ORDERED**, this 3rd day of September, 2026.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**